IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
*Norfolk Division*

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | )    CRIMINAL NO. 2:19-cr-90 |
| JACLYN AMANDA INGE, | ) |
| | ) |
| Defendant. | ) |

**United States' Response in Opposition to
Defendant's Motion for Compassionate Release**

The United States files this response in opposition to Jaclyn Amanda Inge's motion for

compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). The defendant is currently serving a

78-month sentence at FPC Alderson in Alderson, West Virginia for possession of a firearm by an

unlawful user of controlled substances, in violation of 18 U.S.C. §§ 922(g)(3) and 924(a)(2).

She seeks early release from prison due to medical conditions that place her at higher risk of

COVID-19. Because the defendant has failed to put forth an "extraordinary and compelling"

reason for release in light of being fully vaccinated, and because the statutory sentencing factors

in 18 U.S.C. § 3553(a) do not support release where she has served less than a third of her

sentence, the Court should deny her motion.

**Background**

**I.     Facts**

As the defendant admits in the statement of facts, in August and September 2017, she

purchased two handguns at two different gun shows after lying on the Form 4473 by indicating

that she was not an unlawful user of controlled substances when, in fact, she was addicted to

marijuana "and had used the drug daily for several years." Statement of Facts (hereinafter,

"SOF"), ECF No. 20, ¶¶ 1–2.

The defendant was also, however, a key player in an armed robbery. The defendant was employed by Mac's Reloads, a federally licensed ammunition-reloading business, and she moonlighted as the manager of "a rap duo titled Eye Tunes Nation." Presentence Investigation Report, (hereinafter "PSR") ¶ 7. She conspired with that duo—Desmond Littlejohn and an unindicted conspirator—to rob Mac's Reloads, and she facilitated the robbery by feeding inside information to the others, including that in the early morning hours of October 9, 2017, the store owner would be returning to the business from a gun show in Philadelphia carrying several thousand dollars in cash in a black bag. *Id.*

While the owner and another employee were unloading their truck, Littlejohn and the other coconspirator ambushed them, pointed guns at them, and demanded that the owner hand over the black bag that the defendant had told them about, or they would shoot the employee. PSR ¶ 8. The owner told them that the bag was inside the residence (the owner ran the business out of his home in Virginia Beach), so the coconspirator ran in, grabbed the bag, and came back out while Littlejohn held the victims at gunpoint. *Id.* With the bag in hand, Littlejohn and the coconspirator stabbed their guns in the victim's backs, moved them to the backyard, separated them, and ordered them to lie face down in the ground. The owner feared for his life and thought he and the employee were going to be shot and killed. The employee begged for her life and told the robbers that she and the owner had children. The conspirator then told the victim that he knew the victims had children "and knew their names, where they lived, and everything about [the victims'] children." *Id.*

"[T]he defendant provided Littlejohn and [the coconspirator] with the information regarding [the victims], the information related to the gun show, the information regarding money obtained from the gun show and the firearms they utilized in the robbery," including the

Jiminez Arms handgun charged in the indictment that the defendant had purchased at a gun show roughly two months beforehand.  PSR ¶ 12.

Littlejohn and the coconspirator "fled the scene with the black bag and money bags," which totaled more than $10,0000, but they dumped the bag's remaining contents, including a firearm and empty money bags, as well as the bag itself, onto the street during flight. PSR ¶ 11. Investigators sent the ski mask to the lab, which extracted DNA matching Littlejohn's. *Id.* Littlejohn was then indicted for conspiracy to commit Hobbs Act robbery, substantive Hobbs Act robbery, and brandishing a firearm in furtherance of a crime of violence.  PSR ¶ 4.  He went to trial, was convicted on all three counts, and was sentenced to 189 months in prison.  *Id.*  A major theme of the government's case in chief was that the robbery was an inside job facilitated by the defendant.

Further, the defendant almost crossed the witness-tampering line during the proceedings against her.  "[S]ubsequent to the defendant's indictment for the instant offense, she attempted to contact individuals for the purpose of soliciting information that would 'diminish' the character of a possible witness to her marijuana use."  PSR ¶ 13.  She also "stated that the witness's 'snitching was going to catch up' to him/her."  *Id.*  And *after her guilty plea*, on a recorded jail call on January 13, 2020 she told a co-conspirator "If I were you, I'd get out and flee."  *Id.* ¶ 83.

## II.    **Procedural Background**

In June 2019, a federal grand jury sitting in Norfolk returned an indictment charging the defendant with making a materially false statement during the purchase of a firearm, in violation of 18 U.S.C. §§ 922(a)(6) and 924(a)(2) (Count One); causing a federally licensed firearms dealer to maintain false records, in violation of 18 U.S.C. § 924(a)(1)(A) (Count Two); and drug-user in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(3) and 924(a)(2) (Count Three).  In November 2019, the defendant pleaded guilty to Count Three under a plea agreement.

The defendant was initially released on bond. While on presentence release, the defendant "submitted a urine specimen that was positive for marijuana and signed an admission form admitting to drug use on January 19, 2020." PSR ¶ 17. She also "submitted a positive urine specimen for marijuana on February 3, 2020." PSR ¶ 79. On February 28, 2020, she was detained pending her sentencing hearing after moving to revoke her own bond. ECF No. 30 (order revoking bond), ECF No. 39 at 2 (government sentencing position paper recounting procedural history).

While the defendant was in custody, the COVID-19 pandemic began in the United States. On May 14, 2020, the defendant moved to reinstate her bond because of her "pre-existing heart condition and other medical conditions," which she stated put her "at a higher risk for complications should she contract the virus." ECF No. 34 at 2. However, she withdrew the motion several days later and remained in custody pending sentencing. ECF No. 36.

At the defendant's sentencing hearing on October 15, 2020, the Court determined the final advisory sentencing guidelines range as 70 to 87 months of imprisonment. ECF No. 48 (final PSR). It sentenced the defendant to 78 months of imprisonment, followed by three years of supervised release. ECF No. 46.

## III.   Defendant's motion for compassionate release

The defendant has filed two requests with FPC Alderson's Warden. On January 16, 2021, she requested compassionate release "due to COVID 19- and my associated risk factors. I have High Blood pressure, morbid obesity and auto immune issues." Exhibit A. The Warden denied this request on January 26, 2021, after a review of the defendant's medical records, concluding that her "medical condition does not meet the criteria" for release in BOP policy documents. ECF No. 49-1 at 4. Some six months later, she requested placement on home confinement under the CARES Act, stating her offense of conviction was non-violent and that

she has "more than 1 CDC risk factor." *Id.* at 3.  The Warden denied the request on July 15, 2021, stating she was not eligible for early release because she had only served 24.7% of her sentence and had more than eighteen months left to serve.  *Id.* at 2.

The defendant's compassionate release motion in this Court was filed on January 4, 2022. ECF No. 49.  She requested her sentence be modified to time served with a special condition of home confinement.  *Id.* at 1.  She stated she had COVID-19 risk factors of morbid obesity (BMI 46%), high blood pressure, history of smoking (over 25 years) and mitral-valve prolapse.  *Id.* at 2.  The defendant also noted there was an "outbreak" at her facility, that it had "the highest number of cases in all of the Bureau of Prisons facilities," and that 25% of the population was infected or recovered.  *Id.* at 2.  The defendant's motion did not include a release plan that would detail where and with whom she would live if released, other than stating she would live in "my residence."  *Id.* at 1.

## IV.     BOP efforts to mitigate the effects of COVID-19.

The federal Bureau of Prisons ("BOP") has implemented several measures to contain the spread of the virus within prison populations.  In recent months, BOP has made significant progress in distributing and administering vaccines to staff and inmates at its facilities.  BOP has also maintained COVID-19 protocols designed to prevent community spread, including limiting access to prisons, restricting prisoner movement within prisons, requiring screening and testing, providing masks and hand cleaners, and separating ill inmates from the rest of the population.

BOP has offered the vaccine to every inmate in BOP-managed institutions, except certain inmates who were recently admitted to facilities after vaccines had been administered.  BOP has also offered the vaccine to all staff members.  *Oversight of the Federal Bureau of Prisons: Hearing Before the S. Comm. on the Judiciary*, 117th Cong. 5 (2021) (statement of Michael D. Carvajal, Director, BOP).  All inmates are also now eligible to receive a COVID-19 booster shot.

*COVID-19 Vaccine Guidance*, BOP 4 (Oct. 13, 2021),

https://www.bop.gov/resources/pdfs/covid_19_vaccine_guidance_v14_0_2021.pdf.  Consistent

with guidance issued by the Centers for Disease Control and Prevention ("CDC"), BOP has

prioritized offering booster shots to inmates assigned to health service unit jobs; inmates in

nursing care centers or other residential health care units; and inmates aged 65 years and older or

those of any age with underlying medical conditions.  *Id.*  At this time, however, any inmate who

requests a booster should be able to receive one.  As of the date of this filing, BOP has

administered a total of 292,229 doses of the vaccine at its facilities.  *COVID-19 Vaccine*

*Implementation*, BOP, https://www.bop.gov/coronavirus/.  BOP will continue to offer the

vaccine to newly arrived inmates and to inmates who initially declined the vaccine if they change

their minds.

 BOP also continues to operate under modified conditions according to three indicators

of transmission risk: the facility's COVID-19 inmate medical isolation rate, the combined

percentage of staff and inmate completed vaccinations, and the transmission rate of the county

where the facility is located.  *COVID-19 Modified Operations Matrix*, BOP (Aug. 16, 2021),

https://www.bop.gov/foia/docs/attachment2_covid19_modified_ops_matrix_2021_08_16.pdf.

All inmates and staff must wear face coverings at all times in all indoor environments.  *Id.* at

2.  All areas, supplies, and equipment are cleaned daily.  *Id.* at 4.  Additionally, medical staff

screen every newly admitted inmate for COVID-19.  *COVID-19 Pandemic Response Plan*,

BOP (July 15, 2021),

https://www.bop.gov/foia/docs/COVID_pandemic_plan_docs_v6_2021_07_16.pdf.  Inmates

who are asymptomatic and test negative are placed in quarantine for 14 days.  *Id.* at 74.

Inmates who are symptomatic and/or test positive are placed in medical isolation.  *Id.* at 73.

Medical staff will test all other inmates for COVID-19 if they are symptomatic or if they are asymptomatic but have been exposed to a suspected or known case of COVID-19. *COVID-19 Modified Operations Matrix*, at 4.

Inmates who are transferring between facilities, moving to other correctional jurisdictions, or being released from BOP custody must quarantine for 14 days. *Id.* BOP will not transfer or release inmates with active COVID-19 "unless absolutely necessary." *COVID-19 Pandemic Response Plan*, at 72. For immediate releases where the inmate could not quarantine for 14 days, BOP provides a symptom screen, temperature check, and COVID-19 test on the day of departure and notifies the health authorities in the local jurisdiction if necessary. *Id.* at 76.

BOP previously suspended social visits but has since reinstated visits, directing each institution to adopt a visiting plan consistent with its resources, including space. *BOP Modified Operations*, BOP (Nov. 25, 2020), https://www.bop.gov/coronavirus/covid19_status.jsp. Both the inmate and the visitor must wear facial coverings at all times. *Modified Operations Matrix*, at 6.

## V.     Conditions at the defendant's facility

The defendant is currently serving her sentence at FPC Alderson ("Alderson"), a minimum security facility in Alderson, West Virginia. BOP Inmate Locator, *Jaclyn Amanda Inge*, https://www.bop.gov/inmateloc/. As of the date of this filing, she has served approximately 709 days, or 1 year and 11 months,[1] which is about 29.9% of her 78-month sentence. Accounting for good conduct time, her projected release date is September 9, 2025.

---

[1] When the defendant was sentenced on October 15, 2021, she had already served 232 days in custody. Exhibit B (inmate data dated January 12, 2022).

*Id.* (last visited February 1, 2022).

Alderson has a total of 643 inmates.  https://www.bop.gov/locations/institutions/ald/ (last visited February 3, 2022).  As of the date of this filing, 52 inmates and 11 staff members at Alderson are positive for COVID-19.[2]  *COVID-19 Cases*, BOP, https://www.bop.gov/coronavirus/.  244 inmates and 42 staff members previously tested positive for COVID-19 and have since recovered.  *Id.*  Further, as of the date of this filing, 522 inmates and 75 staff members have received both doses of the COVID-19 vaccine.  *COVID-19 Vaccine Implementation*, BOP, https://www.bop.gov/coronavirus/.  The defendant received her first dose of the Moderna vaccine on April 19, 2021, and her second dose on May 17, 2021.  Exhibit C at 1 (filed under seal).  The defendant received a Moderna booster shot on December 24, 2021.  *Id.*

The government has obtained the defendant's BOP medical records between January 12, 2021 and January 12, 2022.  They reveal one negative COVID-19 test on December 4, 2021 and no positive test.  Exhibit C at 2.  The defendant does not allege that she has ever tested positive for COVID-19.

## Argument

I.      **The Court should deny the defendant's motion because she has not established an extraordinary and compelling reason for compassionate release.**

The defendant has not established that this Court should exercise its discretion under § 3582(c)(1)(A)(i) to grant compassionate release.  While she has several conditions that increase her risk from COVID-19—namely high blood pressure, severe obesity, and a history of smoking—because she has been fully vaccinated and received a booster shot, and has not shown

---

    [2] Although defendant asserts that Alderson has "the highest number of cases in all of the Bureau of Prisons facilities," the BOP's data indicate it is approximately 44th of BOP facilities sorted by number of positive inmate cases.

this will not substantially mitigate her risk from COVID-19, she cannot show an extraordinary and compelling reason for release.[3]

Section 3582(c)(1)(A) authorizes a court to reduce a term of imprisonment when "extraordinary and compelling reasons warrant such a reduction." Although the statute "does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release," the Sentencing Commission has "addressed the issue in a policy statement." *United States v. McCoy*, 981 F.3d 271, 276 (4th Cir. 2020). According to the policy statement, "extraordinary and compelling reasons" may exist based on the defendant's medical condition, age, family circumstances, or other reasons as determined by BOP. U.S.S.G. § 1B1.13. If a district court finds that extraordinary and compelling reasons exist, the court may not reduce a sentence before "considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent they are applicable." § 3582(c)(1)(A). The defendant bears the burden of proving that she is entitled to relief under § 3582(c)(1)(A). *See, e.g.*, *Ward v. United States*, 11 F.4th 354, 361 (5th Cir. 2021); *see also United States v. Molina*, No. 3:12cr132, 2021 WL 1587904, at *2 (E.D. Va. Apr. 22, 2021); *United States v. Watson*, No. 1:07-cr-396, 2020 WL 7318269, at *1 (E.D. Va. Dec. 11, 2020).

The Fourth Circuit's decision in *McCoy* does not reduce the defendant's burden of establishing an "extraordinary and compelling" reason for relief under § 3582(c)(1)(A). In *McCoy*, the court held that the policy statement in U.S.S.G. § 1B1.13 is not "applicable" to compassionate release motions brought by defendants under § 3582(c)(1)(A). 981 F.3d at 281–

---

[3] The defendant properly exhausted her administrative remedies by filing a request for compassionate release with Alderson's warden on January 16, 2021, which the warden denied on January 26, 2021. Although the defendant also requested release to home confinement in July 2021, this was not a request for compassionate release but instead for placement under the CARES Act.

82.  Because § 1B1.13 "was adopted before the First Step Act" and specifically mentions only motions brought by BOP, the court reasoned that the policy statement does not apply to motions brought by defendants.  *Id.* at 282.  Absent an applicable policy statement, district courts should "make their own independent determinations of what constitutes an 'extraordinary and compelling reason[]' under § 3582(c)(1)(A), as consistent with the statutory language."  *Id.* at 284.  The Fourth Circuit noted, however, that § 1B1.13 "remains helpful guidance even when motions are filed by defendants." *Id.* at 282 n.7.

More recently, the Fourth Circuit explained that "[b]oth before and after the change authorizing defendant-filed motions, § 3582(c) continues to describe the substantive ground the same—that a court may reduce a sentence 'if it finds that … extraordinary and compelling reasons warrant such a reduction.'" *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021) (quoting 18 U.S.C. § 3582(c)(1)(A)(i)); *accord United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020) ("The substantive aspects of the Sentencing Commission's analysis in § 1B1.13 and its Application Notes provide a working definition of 'extraordinary and compelling reasons'; a judge who strikes off on a different path risks an appellate holding that judicial discretion has been abused.").  Thus, even after *McCoy*, § 1B1.13 can serve as a guidepost for a district court exercising its discretion.  *See High*, 997 F.3d at 186; *see also, e.g.*, *United States v. Bowser*, No. 2:16cr95, 2021 WL 1904321, at *2 (E.D. Va. May 12, 2021); *United States v. Shepherd*, No. 1:14-cr-257 (RDA), 2021 WL 1894181, at *3 (E.D. Va. May 11, 2021); *United States v. Smith*, No. 3:20cr14, 2021 WL 682067, at *3 (E.D. Va. Feb. 22, 2021).  Indeed, in conflict with *McCoy*, the Eleventh Circuit has held that § 1B1.13 "is an applicable policy statement that governs all motions under Section 3582(c)(1)(A)," such that "district courts may not reduce a sentence under Section 3582(c)(1)(A) unless a reduction would be consistent with 1B1.13." *United States v.*

*Bryant*, 996 F.3d 1243, 1262 (11th Cir. 2021).

Courts have held that the COVID-19 pandemic, by itself, is not a sufficient basis for compassionate release. *See, e.g.*, *United States v. Marcussen*, 15 F.4th 855 (8th Cir. 2021); *United States v. Thompson*, 984 F.3d 431, 435 (5th Cir. 2021) ("Fear of COVID doesn't automatically entitle a prisoner to release."); *Raia*, 954 F.3d at 597 ("[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release …."). Given the widespread availability of the COVID-19 vaccine at BOP facilities, several courts have concluded that "a defendant's incarceration during the COVID-19 pandemic—when the defendant has access to the COVID-19 vaccine—does not present an 'extraordinary and compelling reason' warranting a sentence reduction." *United States v. Lemons*, 15 F.4th 747, 751 (6th Cir. 2021); *see United States v. Broadfield*, 5 F.4th 801, 803 (7th Cir. 2021) ("[F]or the vast majority of prisoners, the availability of a vaccine makes it impossible to conclude that the risk of COVID-19 is an 'extraordinary and compelling' reason for immediate release.")

At minimum, "a general fear of contracting COVID-19, without a sufficient basis for that fear, does not provide an extraordinary and compelling reason for a defendant's release." *United States v. Chandler*, No. 3:15mj122( (DJN), 2020 WL 6139945, at *5 (E.D. Va. Oct. 19, 2020). Instead, the Fourth Circuit has cited with approval the requirement that, "[i]n the context of the COVID-19 outbreak," a defendant must show "both a particularized susceptibility to the disease and a particularized risk of contracting the disease at his prison facility" to establish an extraordinary and compelling reason for compassionate release. *United States v. Reams*, 847 F. App'x 199, 199 (4th Cir. 2021) (per curiam) (quoting *United States v. Feiling*, 453 F. Supp. 3d 832, 841 (E.D. Va. 2020)).

The defendant has not established an extraordinary and compelling reason for compassionate release because she has not shown that she faces a "particularized susceptibility" to COVID-19. *United States v. Adamson*, 831 F. App'x 82, 83 (4th Cir. 2020). She asserts that she has morbid obesity, high blood pressure, a 25-year history of smoking, and mitral-valve prolapse, all of which she says place her at risk of developing severe symptoms if she contracts the coronavirus. ECF No. 49 at 2. Although several of these conditions do place her at higher risk, because she is fully vaccinated (and received a booster shot), she has not established that she is entitled to relief under § 3582(c)(1)(A).

"To establish a particularized susceptibility to COVID-19, courts have required defendants to provide evidence that they suffer from a medical condition identified by the [CDC] as a COVID-19 risk factor." *Chandler*, 2020 WL 6139945, at *5. The defendant asserts that she suffers from morbid obesity, high blood pressure, a 25-year history of smoking, and mitral-valve prolapse. The defendant's PSR noted only some of these conditions, and did not note that any medical records corroborated the same. Specifically, the PSR noted only the defendant's weight and her own report that "she was diagnosed with microvalve prolapse as a teenager and suffers from heart palpitations as a result of this issue. No treatment or medication is necessary to treat the same." PSR ¶¶ 53–55. However, the PSR did not state that any medical records supported this condition. Notably, the defendant's medical conditions and any risk for COVID-19 were not raised in her sentencing position paper or at the sentencing hearing, even though she was sentenced during the COVID-19 pandemic. *See generally* ECF Nos. 40 & 53.

Accordingly, undersigned counsel has reviewed the defendant's past year of BOP medical records, which support most of these health conditions. Specifically, they document a

Body Mass Index ("BMI") between 40.0 and 44.9,[4] essential (primary) hypertension, and a history of tobacco use. Exhibit C at 3–4. However, the medical records do not appear to document the defendant's claimed mitral-valve prolapse, and without any apparent medical records submitted to the Probation Office, either, the defendant has not met her burden of demonstrating she has this medical condition.[5]

According to the CDC, individuals with a smoking history, severe obesity, and possibly individuals with hypertension, are more likely to suffer severe illness from COVID-19. *People with Certain Medical Conditions*, CDC (Dec. 14, 2021), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. The defendant's medical records indicate that she has been prescribed medications to treat high blood pressure. Exhibit C at 5–6. Thus, defendant has not established that BOP cannot adequately manage her medical needs. *See, e.g.*, *United States v. Smith*, No. 3:15-cr-101 (REP), 2021 WL 3641463, at *3 (E.D. Va. Aug. 17, 2021) (finding that defendant's medical conditions were "chronic conditions that

---

[4] The CDC identifies this range as "severe obesity." *People with Certain Medical Conditions*.

[5] Mitral valve prolapse is "the bulging of one or both of the mitral valve flaps (leaflets) in the left atrium during the contraction of the heart. . . . One or both of the flaps may not close properly, allowing the blood to leak backward (regurgitation). Mitral regurgitation (backward flow of blood), if present at all, is generally mild. . . . Treatment is not usually necessary as Mitral Valve Prolapse is rarely a serious condition. . . . This condition is usually harmless and does not shorten life expectancy." *Mitral Valve Prolapse*, Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/mitral-valve-prolapse (last visited February 1, 2022). The CDC states that conditions such as "heart failure, coronary artery disease, cardiomyopathies, and possibly high blood pressure (hypertension" can increase the risk of severe illness from COVID-19, but the CDC does not list mitral valve prolapse as increasing an individual's risk. *People with Certain Medical Conditions*. Generally, courts have found that defendants who suffer from medical conditions that the CDC does not recognize as posing a greater risk of severe illness from COVID-19 have not established "extraordinary and compelling reasons" for compassionate release. *See, e.g.*, *United States v. Prater*, No. 3:13cr133 (DJN), 2021 WL 54364, at *6 (E.D. Va. Jan. 6, 2021) (finding no particularized susceptibility based on prostate and bladder issues).

[could] be managed in prison [and thus] [were] not a sufficient basis for compassionate release" (internal quotation marks omitted)).

In any event, the defendant does not face a particularized susceptibility of contracting COVID-19 because she is fully vaccinated. The defendant received her first dose of the Moderna vaccine on April 19, 2021 and her second dose on May 17, 2021. The defendant also recently received a Moderna booster shot on December 24, 2021. The CDC represents that vaccination will protect individuals from getting sick with COVID-19 and "are effective at preventing . . . serious illness, and death" even if they do contract the virus. *COVID-19 Vaccines Work*, CDC (Dec. 23, 2021), https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/work.html. Specifically, according to the CDC, the Moderna vaccine is 94.1% effective at preventing illness from COVID-19. *Moderna COVID-19 Vaccine Overview and Safety*, CDC (Feb. 1, 2022), https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines/Moderna.html.

Even acknowledging defendant's severe obesity, smoking history, and hypertension, "it is now well understood" that, "following full vaccination," "both the likelihood of contracting COVID-19 and the associated risks should one contract the virus are significantly reduced." *Lemons*, 15 F.4th at 751. Accordingly, "because the vaccine mitigates the risk of contracting COVID-19, the defendant must provide other evidence to establish an extraordinary and compelling reason for compassionate release based upon his concern about contracting the virus." *Smith*, 2021 WL 3641463, at *3; *see United States v. Kurzynowski*, 17 F.4th 756, 758 (7th Cir. 2021) (concluding that "the fact that [the defendant was] vaccinated preclude[d] a finding that the COVID-19 pandemic presents extraordinary and compelling reasons for his release"). Without more, defendant has not established a particular susceptibility to COVID-19

that would constitute extraordinary and compelling circumstances.  *See, e.g.*, *Martinez v. United States*, No. 2:13-cr-122 (RAJ), 2021 WL 5139496, at *3 (E.D. Va. Nov. 3, 2021) (finding that the defendant failed to show a particularized susceptibility to COVID-19 because he had received both doses of the vaccine); *Smith*, 2021 WL 3641463, at *3 (same); *United States v. Sidhu*, No. 1:14-cr-399 (RDA), 2021 WL 2894723, at *5 (E.D. Va. July 9, 2021) (similar).

The defendant has not alleged that any of her medical conditions would render the COVID-19 vaccine ineffective.  *Cf. Lemons*, 15 F.4th at 751 ("[A] prisoner who is 'unable to receive or benefit from a vaccine' may still be able to show 'extraordinary and compelling reasons' warranting a sentence reduction.").   Further, with a booster shot, the defendant should have "an increased immune response" and "improved protection against getting infected with COVID-19."  *COVID-19 Vaccine Booster Shots*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html (Feb. 2, 2022).

II.     **The Court should also deny the defendant's motion because the statutory sentencing factors do not support release.**

Even if the Court determines that the defendant has demonstrated an extraordinary and compelling reason for compassionate release, it should deny the defendant's motion because the statutory sentencing factors weigh against release.  *See, e.g.*, *High*, 997 F.3d at 187.  Section 3582(c)(1)(A) requires a court to consider the factors set forth in 18 U.S.C. § 3553(a) before reducing a defendant's sentence.  Those factors include "the nature and circumstances of the underlying offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), and "the need for the sentence imposed" "to reflect the seriousness of the offense, [] promote respect for the law, and [] provide just punishment for the offense," "to afford adequate deterrence to criminal conduct," and "to protect the public from further crimes of the defendant," *id.* § 3553(a)(2).  Courts should also consider "the kinds of sentences available," *id.* § 3553(a)(3),

and "the need to avoid unwarranted sentence disparities," *id.* § 3553(a)(6). Additionally, "the Sentencing Commission has emphasized that a defendant's rehabilitation while incarcerated," by itself, is "insufficient to warrant a sentence reduction." *United States v. Woolridge*, No. 3:09cr156, 2021 WL 415131, at *3 (E.D. Va. Feb. 5, 2021) (citing U.S.S.G. § 1B1.13 n.3); *see* 28 U.S.C. § 994(t) ("Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason" for a sentence reduction.). In this case, the relevant statutory sentencing factors do not support compassionate release.

   *The seriousness of the offense (§ 3553(a)(2)(A).* The seriousness of the defendant's offense weighs heavily against her release. Courts in this district consistently have denied compassionate release based on the seriousness of the defendant's offense. *United States v. Reid*, No. 2:02cr172-7, 2020 WL 7318266, at *3 (E.D. Va. Dec. 10, 2020) (finding that the statutory sentencing factors weighed against release where the defendant had "served as a 'manager' in a vast drug-trafficking conspiracy" and "continued his wrongful conduct even after his arrest by directing a co-conspirator to collect drug proceeds"); *see also, e.g.*, *Prater*, 2021 WL 54364, at *6 (finding that a defendant convicted of drug and firearm-related offenses had "proved his willingness to deal drugs on a large scale and to use violence in furtherance of that drug-dealing activity"); *Albury v. United States*, No. 2:19-cr-68, 2020 WL 6779643, at *5 (E.D. Va. Oct. 23, 2020) (finding that the statutory sentencing factors weighed against release where the defendant "was convicted of a large-scale drug trafficking crime that he conducted over the course of five years," "possessed firearms," and "often travelled interstate to purchase and sell drugs").

   The most serious aspect of the defendant's criminal conduct is that she provided co-conspirators information facilitate the armed robbery of her own employer. The defendant told

her friends, the armed robbers, that her employers would be carrying a large amount of money on a certain date. That resulted in an armed robbery where co-conspirators put guns at the backs of the innocent victims, who begged for their lives and the safety of their children, and stole over $10,000. ECF No. 39 (government position paper), 5–6 (describing crime). At the defendant's sentencing hearing, the Court described the defendant's actions as "atrocious conduct." Tr. 15. A sentence of two years—the result if the defendant's motion were granted—would fail to sufficiently account for the gravity of this conduct.

*Promote respect for the law & provide just punishment (§ 3553(a)(2)(A)).* Courts in this district "have considered the length of time served an important factor when ruling on motions for compassionate release during the COVID-19 pandemic." *United States v. Evans*, No. 3:00cr63, 2020 WL 5121331, at *7 (E.D. Va. Aug. 31, 2020) (finding, even though the defendant's health conditions presented "extraordinary and compelling reasons" for release, that release after the defendant had served "well under half of her sentence[] would not provide just punishment or afford adequate deterrence for like offenses" (internal quotation marks omitted)); *see also United States v. Lloyd*, No. 2:11cr36, 2020 WL 4501811, at *3 (E.D. Va. Aug. 5, 2020) (finding, where the defendant "ha[d] served less than half of his sentence even when sentencing credits [were] considered," that "[t]he need to provide adequate deterrence for this Defendant" and "to avoid unwarranted sentencing disparities" weighed against release); *United States v. Hill*, No. 3:14cr114, 2020 WL 6049912, at *5 (E.D. Va. Oct. 13, 2020) (denying compassionate release where the defendant had "served only 40% of his 188 month sentence, which may not afford adequate deterrence to his criminal conduct"). In this case, the defendant has served less than a third of her sentence, such that compassionate release would fail to promote respect for the law and provide just punishment.

*Avoid unwarranted sentencing disparities (§ 3553(a)(6)).* One of the defendant's co-conspirators, Desmond Littlejohn, is serving a sentence of 189 months of imprisonment. No. 2:18cr119. Although Littlejohn is more culpable than the defendant because he conducted the armed robbery and brandished a firearm during the robbery, the defendant was an integral part of the same event, as she provided Littlejohn with the necessary information about her employers and the money they would be carrying. An effective sentence for the defendant of two years of imprisonment—about one-eighth of Littlejohn's sentence—would create unwarranted sentencing disparities with Littlejohn.

*Affording adequate deterrence and protecting the public ((§ 3553(a)(2)(B), (C)).* Compassionate release is also not appropriate because the releasing the defendant now would present a danger to the safety of others and the community by failing to deter her from further criminal conduct. The defendant's crime involved firearms, possessed by both herself and by her co-conspirators, and an armed robbery. In such circumstances, courts considering compassionate release motions have found a risk to public safety weighs against release. *See United States v. Harris*, No. 3:11cr156, 2020 WL 7646633, at *5 (E.D. Va. Dec. 23, 2020) (noting "the defendant "has more than one offense involving firearms, which raises concerns about public safety should he be released"); *Lloyd*, 2020 WL 4501811, at *4 ("Defendant was also attributed with a firearm at sentencing, a fact that further underscore[d] the seriousness of his criminal conduct."); *United States v. Pilgrim*, No. 3:19cr50-01, 2021 WL 2003548, at *4 (E.D. Va. May 19, 2021) (finding, where the defendant's "convictions [were] for crimes of violence, involving the use of a firearm" and the defendant "was involved in more robberies than the two reported in the offenses of conviction," that "the protection of the public and the need to deter [the defendant] from further criminal conduct" weighed against a sentence reduction).

The Court stated at sentencing that it was not "worried about this defendant committing any more crimes." Tr. 23. However, it also noted the defendant's struggles with substance abuse and that "[o]ne of the factors in dealing with controlled substances is that the individuals who are involved in the distribution of it are all pretty bad individuals to start with and it creates a bad situation." Tr. 24. Here, the defendant's documented history of substance abuse increases her risk of committing further crimes; this is particularly so because although BOP has approved her for its residential drug treatment program, she has not completed the program. Exhibit D (inmate history – drug programs). While the defendant is free of disciplinary infractions at BOP, if released to the community now her risk of returning to substance abuse would contribute to the potential for recidivism.[6] The government also notes the defendant's troubling continued involvement with criminal activity, such as warning a witness about "snitching" after she was indicted, and warning a co-conspirator to "flee" even after she had pleaded guilty.

The defendant asserts that compassionate release is appropriate based on evidence of her rehabilitation while in prison. Specifically, she has completed classes in poetry, cartoons, and is currently taking cosmetology. Exhibit E (inmate education data); ECF No. 49-1 at 5. Although the defendant's steps toward self-improvement are commendable, these efforts are not so extraordinary as to support a sentence reduction. *See, e.g.*, *High*, 997 F.3d at 190 (concluding, where the defendant argued that he "had completed courses in Drug Education and Wellness at Risk and that he had not received any disciplinary infractions," that these factors were not "exceptional post-sentencing conduct" that would support a sentence reduction (internal

---

[6] The defendant attached her PATTERN risk scoring, which assessed her risk of recidivism as "minimal." However, the worksheet assigned zero points for a violent offense. ECF No. 49-1, at 7. While it is true that the defendant's crime of conviction was not violent, her relevant conduct did involve violence, as she helped plan and facilitate an armed robbery where firearms were brandished at innocent victims.

quotation marks omitted)); *United States v. Wilson*, No. 20-6047, 2020 WL 8872371, at *2 (6th

Cir. Dec. 30, 2020) (concluding that "rehabilitation alone does not provide a proper basis for

relief, and the rehabilitation efforts documented by [the defendant] were not so

out-of-the-ordinary as to render the district court's decision an abuse of discretion").

      Courts in this district repeatedly have held that "[r]ehabilitation of the defendant alone

shall not be considered an extraordinary and compelling reason" for compassionate release.

*United States v. Hill*, No. 3:14cr114, 2020 WL 6049912, at *5 (E.D. Va. Oct. 13, 2020) (quoting

28 U.S.C. § 994(t)); *see Woolridge*, 2021 WL 415131, at *3.  Indeed, "rehabilitation is the *only*

circumstance that Congress has singled out as *not* being 'extraordinary and compelling.'"  *United*

*States v. Logan*, No. 97-CR-99(3) (PJS/RLE), 2021 WL 1221481, at *7 (D. Minn. Apr. 1, 2021).

This limitation makes sense because defendants are expected to conduct themselves

appropriately and try to better themselves while incarcerated.  *See, e.g.*, *Logan*, 2021 WL

1221481, at *8 ("Prisoners are *supposed* to follow the rules, take classes, work at a job, and

otherwise attempt to improve themselves.  That a prisoner does so means that he has met

baseline expectations, not that he has done something extraordinary."); *United States v. Martin*,

No. 6:06-105-DCR, 2021 WL 134602, at *2 (E.D. Ky. Jan. 13, 2021) ("[G]ood behavior and

education, which are expected of incarcerated individuals, do not constitute 'extraordinary and

compelling circumstances' that warrant a sentence reduction."); *see also* Order at 6, *United*

*States v. Ahmad*, No. 1:11-cr-554-TSE, ECF No. 75 (E.D. Va. Apr. 8, 2021) (finding that the

defendant's coursework did not support compassionate release, reasoning that "[i]t is not

uncommon for a defendant to take educational classes to pass the time in prison").

      Consequently, the defendant's efforts at rehabilitation do not outweigh the seriousness of

her crime and the small percentage of her sentence that she has seved.  *See, e.g.*, *Pilgrim*, 2021

WL 2003548, at *4 (finding, where the defendant took "a number of educational and vocational courses and earned her GD," that her "commendable activity [did] not overcome" her "violent offense conduct or lessen in any way the need to deter her and to protect the public"); *Lloyd*, 2020 WL 4501811, at *4 n.7 ("While the Court commends Defendant for his documented efforts to work toward rehabilitation during his term of incarceration, his good behavior and pursuit of education in an institutional setting is insufficient to tip the scales in his favor based on the consideration of the record as a whole."); *Hill*, 2020 WL 6049912, at *5 ("While Hill's participation in an extensive number of educational and vocational programs [was] commendable," these measures did "not warrant his early release in light of the seriousness of his convictions and the time remaining on his sentence.").

The defendant's threadbare "release plan" also fails to adequately protect against recidivism. She only states that she would live at "her residence." She does not detail whom, if anyone, she would live with, or whether she would be living in the exact same living situation as when she engaged in the conduct leading to her conviction and violated the terms of her bond. *Holloman v. United States*, No. 4:14-CR-68, 2020 WL 5913994, at *3 (E.D. Va. Oct. 6, 2020) (expressing concern that defendant's "release plan does not adequately protect the public" where his plan "would have him return to his parents' home—the same location in which the initial offense occurred"). Further, the defendant has not proposed a viable plan for his continued supervision if released. *Coleman v. United States*, 465 F. Supp. 3d 543, 550 (E.D. Va. 2020) (denying compassionate release where the court had no "confidence" that the defendant's "release plan [would be] conducive to appropriate conditions of supervision and would provide the community with adequate protection against the potential for a subsequent offense.").

Because the § 3553(a) factors counsel against relief, the defendant is not entitled to

compassionate release.

## Conclusion

The Court should deny the defendant's motion for compassionate release.

Respectfully submitted,

Jessica D. Aber
United States Attorney

_____ /s/
E. Rebecca Gantt
United States Attorney's Office
101 W. Main St., Suite 8000
Norfolk, Virginia 23510
Office:    (757) 441-6331
Fax:        (757) 441-6689
Email: rebecca.gantt@usdoj.gov

**Certificate of Service**

I certify that on February 3, 2022, I electronically filed the foregoing response with the

Clerk of Court using the CM/ECF system, which will serve all counsel of record.

By: _____/s/_____

E. Rebecca Gantt
United States Attorney's Office
101 W. Main St., Suite 8000
Norfolk, Virginia 23510
Office:    (757) 441-6331
Fax:        (757) 441-6689
Email:    rebecca.gantt@usdoj.gov